[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This matter, concerning the validity and enforceability of an "offer to purchase" memorandum, was heard by the Court without the intervention of a jury. The Plaintiff contends that the document enjoys the status of a purchase and sales agreement while the Defendants characterize it as merely an "agreement to agree."
The Plaintiff, Dr. Deborah Very-King, has owned and operated child day care centers since 1992. In November 1999, she was searching for a suitable location in West Warwick and became interested in the Defendant's property located at 1300 Main Street. Her real estate agent, Jerry C. Suprenant contacted the listing agent, Don Morash of Abbott Properties and negotiations ensued. The latter culminated in the execution of an offer to purchase (Exhibit 4) which had been prepared by Suprenant. The Defendants signed the document on November 22, 1999, and the Plaintiff signed on November 24, 1999.
After the offer to purchase was signed, the Plaintiff brought several individuals to the Property for inspections. The Defendant treated her cordially and were very cooperative and accommodating during her visits. The offer to purchase burdened the seller with the responsibility of preparing a purchase and sales agreement within fifteen (15) days. After months had passed by and the documents were not forthcoming, Suprenant commenced frequent calls to Morash asking where they were and urging him to "let's get going."
After a May meeting attended by the principals and their attorneys, it appeared to Suprenant, finally, that the parties were "headed for a closing." Suprenant had dealt with the seller's counsel, Mr. Martiesian, in two other transactions and "warned" Morash, less than one month after the offer to purchase was executed, that "Terry can be terribly slow."
Despite the fact that no additional documents had been finalized or executed, Mr. Jacobsen telephoned the Plaintiff in late July 2000 to ask her for an additional $11,000 to complete the agreed upon deposit. Jacobsen explained that the sellers, who were operating an insurance agency on the premises, would feel "more comfortable obtaining new office space" for themselves if they had the additional money. In good faith, the Plaintiff promptly procured a certified check for the requested sum and delivered it to Suprenant to transmit to Morash. Approximately ten (10) days later, Morash informed Suprenant that the sellers "wanted to back out." Jacobsen testified that he had told Morash he was "tired of the delays" and that "we (he and his partner) decided to stay there."
The attorneys who represented the parties during the negotiations also testified at trial. The Plaintiff's counsel, John Brunero, is a real estate attorney with twenty-eight (28) years of experience, who has participated in "thousands of closings." Mr. Brunero opined that the offer to purchase sufficed as a purchase and sales agreement and that the subsequently drafted purchase and sales agreement and lease were not essential to creating enforceable obligations. Although his client had hoped to open the new center by September 2000 to coincide with the onset of the academic year, this was "not critical" and "time was not of the essence." Attorney Brunero confirmed the Plaintiff's testimony that at all times she was, and remains, ready, willing, and able to purchase the property. The last conversation he had with the seller's counsel before the purported repudiation occurred on July 27, 2000. As aforementioned that is the date that the Plaintiff delivered the $11,000 check to her agent at the Seller's request noting "spoke to Bruce [Jacobsen] all set to proceed." [Exhibit 6 at p. 1].
On August 9, 2000, Attorney Brunero wrote to seller's counsel indicating that he had not heard from him since their conversation on July 27, 2000. He also stated: "Your client contacted my client and indicated they wanted an additional good faith deposit so they could proceed to find a new office. My client delivered a check in the amount of $11,000, a copy of which is enclosed. I had not heard from you and now have been informed that your clients do not wish to proceed. My client is ready, willing, and able to proceed and intends to pursue this matter." [Exhibit 6 at p. 2]
This letter confirms the testimonial and documentary evidence relating to the events of August 8, 2000. On that day, the Plaintiff received a voice mail from Mr. Suprenant indicating that "sellers had decided that they liked West Warwick and the Market had changed so they had decided that they would not sell." [Exhibit 17]. The following entries in Mr. Suprenant's telephone log are also significant and corroborating of the Plaintiff's case:
 7/31/2000 — 3:11 p.m. — "Forwarded the $12,000 to Don Morash"
 8/8/2000 — 10:02 a.m. — "DVK (the Plaintiff) called Seller wants out"
 8/16/2000 — 10:04 a.m. — "Discussed problem. Called attorney friend. Referred Deb to Steve Gordon."
 8/21/2000 — 2:05 p.m. — "E-mail from Morash, seller wants to stay in building. Called
Deb (the Plaintiff)."
On August 11, 2000, the seller's counsel notified Attorney Brunero that the sellers were withdrawing the property from the market and that "no agreement" had been entered into by the parties. [Exhibit 5]. While the Sellers acknowledge that the offer to purchase satisfies the requirements for a binding contract under the Statute of Frauds per G.L. (1956) § 9-1-4, they persist in their position that the instrument is merely an "agreement to agree." Since the "contemplated formal, detailed documents were never signed, or agreed to by either party, a binding contract to sell the property did not exist." [Defendant's Post-Trial Memorandum, p. 12].
In support of this contention, the Sellers rely on CentrevilleBuilders, Inc. v. Wynne, 683 A.2d 1340 (R.I. 1996) as controlling. TheCentreville offer to purchase, however, contained two fundamental flaws which are fatal to the creation of a valid contract. First of all, the offer to purchase was made subject to a "satisfactory purchase and sales agreement between buyer and seller." Our Supreme Court deemed such promises "illusory since each party reserved the unfettered discretion to thwart the purchase and sales agreement by unilaterally invoking [this] condition of the offer to purchase agreement and rejecting any purchase and sales agreement as unsatisfactory." Id. at 1341. Subsequent to the signing of the offer to purchase, either party could, at will, subjectively reject any proffered purchase and sales agreement. Thus, the mutuality of obligation necessary for the formation of a binding bilateral contract was lacking. In the instant case, the acceptability of the purchase and sales agreement was to be assessed by the buyer exclusively. [See Exhibit 4 at ¶ 5]. Since this provision inures to the Plaintiff's benefits, she is free to waive it.
Another defeating circumstance in the Centerville offer to purchase was the seller's deletion of a provision requiring him to cease "negotiations with any and all other parties on purchase of subject property." The Supreme Court ruled that "because the Seller was allowed to negotiate with other prospective buyers, the offer to purchase amounted to little more than an agreement to agree at some point in the future. As such, it was not an enforceable bilateral contract." Id. at 1341-42.
No such conditions were ever attached to the instant offer to purchase and the negotiations to purchase the property were exclusively confined to the litigants. Therefore, the principles articulated in Centreville
are not applicable.
The Sellers have also directed the Court's attention to the case of 731Airport Associates LP v. H M Realty Associates, LLC, 799 A.2d 279
(R.I. 2002). The facts of 731, however, are dissimilar to those of the present controversy, because there was no compliance with the Statute of Frauds, a point the Defendant's have already conceded. In 731, there was no documentation whatsoever which had been signed or executed. The parties had a mere preliminary, oral agreement which was not memorialized by any writing. Therefore, the discussion in 731 is not pertinent to this matter.
In this case, the obligation to prepare a purchase and sales agreement rested squarely upon the shoulders of the sellers. The Plaintiff agreed on November 24, 1999 to purchase the property in accordance with the terms of the offer to purchase and promised to execute a purchase and sales agreement to be furnished by the Sellers within 15 days. After the fifteenth day "came and went" — with no documents produced for her execution — the Plaintiff continued to press with her preparations to move in by having inspections, vans painted, securing a phone number and hiring a contractor and an attorney. [See Exhibits 18, 19, 20, 21].
It is clear from the evidence that the parties were operating with the understanding that they were proceeding to a closing. Postponement of the closing was caused by the Seller's failure to produce a purchase and sales agreement. Despite the latter's absence, the Sellers requested and received the $11,000 balance of the deposit on July 31, 2000, approximately seven and a half months after the expiration of the fifteen (15) day limit within which they were to provide a purchase and sales agreement. Time was not of the essence and all parties unequivocally, by implication and otherwise, agreed to extend the time for performance. The delay in carrying out the contract was due to the seller's neglect in fulfilling their promise to produce the instrument. The consideration for extension for time to perform "would be the forbearance on the part of the buyer to demand return of her deposit and/or to pursue such legal remedies as might have been available to her when the conveyance did not take place because of default on the part of the sellers to meet the terms of the agreement." Berube v. Montgomery, 463 A.2d 158, 160 (R.I. 1983). In the instant controversy, the Plaintiff not only exercised such forbearance but also advanced additional monies to the sellers at theirrequest.
Additionally, the fact that the offer to purchase contemplated the preparation of a mere formal written agreement does not serve to negate the validity and enforceability of the offer to purchase. Greensleevesv. Smiley, 694 A.2d 714 (R.I. 1997). In Greensleeves, the seller's real estate agent wrote a letter to the buyer's attorney summarizing the purchase and sales terms which had been agreed to by the parties. The sellers then met with the buyer's attorney and requested that the agent's letter be used as the purchase and sales agreement despite the fact that the letter required the drawing up of a separate document. The buyer telephonically agreed to the use of the letter as the agreement and a closing date was set. Thereafter, the seller received a higher offer for the property in question (condominium dock slips) and entered into an agreement with the higher bidder. As the agent's letter contained all essential terms, the "fact that [the] writing refers to a formal document to be executed in the future did not automatically prevent the initial writing from being binding." Greensleeves, supra., citing GEL Systems,Inc. v. Hyundai Engineering and Construction Co., 902 F.2d 1024, 1027
(1st Cir. 1990). The offer to purchase, here, authored by Agent Suprenant is unambiguous in its provisions and contains all the essential components necessary to make it enforceable.
The Court is also guided in its assessment by the case of Vigneaux v.Carriere, 845 A.2d 304 (R.I. 2004). There, the seller posted a "For Sale by Owner" sign on a tree in her front yard offering her home for sale. In response to the sign, buyer appeared, toured the home, and asked the purchase price. That same day, the buyer agreed to the price, gave a $100 deposit, and prepared a document setting forth the terms of the sale. The buyer secured the requisite financing within the agreed upon thirty-day period. Approximately one month after the document was signed, the parties met to sign a real estate disclosure form. At this meeting, the seller asked the buyer to sign a purchase and sales agreement "drafted by her newly hired attorney." The buyer declined to sign the document because "[they] already had an agreement signed to purchase the home." Later in the day, the seller informed the buyer that she was withdrawing the property from the market in order to get a price higher than that agreed upon.
At trial, the seller contended that the memorandum the parties had signed was defective because it failed to included a closing date and payment terms. She further maintained that the contract lacked mutuality of obligation because it "amounted to little more than an agreement to see if the parties could agree on a purchase and sales agreement at some point in the future." The Supreme Court rejected these arguments.
The Defendants cannot be relieved of their contractual obligations because they "changed their minds" about marketing their property. The mutual obligations of the parties and the terms of the sale and lease are clearly articulated in the offer to purchase. The Plaintiff's deportment and conduct since the inception of this transaction have been that of a ready, willing, and able buyer. She has held up her part of the bargain and the sellers cannot now repudiate their promises.
The fact that certain conditions were inserted in the offer to purchase and subsequently waived is of no impact as they inured to the benefit of the buyer and were hers to forbear.
Therefore, the Court enters judgment for the Plaintiff on the breach of contract action and finds that she is entitled to specific performance.